IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SYZYGY INTEGRATION LLC,<br><br>and<br><br>WESLEY MITCHELL,<br><br>    Plaintiffs,<br><br>v.<br><br>SHERPA 6, INC.,<br><br>and<br><br>JOSEPH DAMES,<br><br>    Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Syzygy Integration LLC ("Syzygy") and Wesley Mitchell ("Mitchell") (together, "Plaintiffs") bring the following Complaint against Defendants Sherpa 6, Inc. ("Sherpa 6") and Joseph Dames ("Dames") (together, "Defendants") for tortious interference with contractual relations and state as follows:

## PARTIES

1. Syzygy is a Pennsylvania limited liability company with its principal place of business in Conshohocken, Pennsylvania.

2. Mitchell is a Pennsylvania resident and is Syzygy's Founder and President.

3. Sherpa 6 is a Delaware corporation with its principal place of business in Littleton, Colorado.

4. Dames is a Virginia resident and is Sherpa 6's Chief Executive Officer.

## JURISDICTION & VENUE

5. This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because the Parties are diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interests and costs.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Montgomery County, Pennsylvania, within this District.

## FACTS

### *Harris's Employment with Syzygy*

7. Since its founding in 2016, Syzygy has focused its business on tactical operations to provide better situational awareness and communication integration to those who defend our country.

8. In February 2018, Mitchell hired Bryan Harris ("Harris") as a senior systems engineer and Syzygy's first employee.

9. In December 2019, Mitchell promoted Harris to the role of Director of Operations.

10. Throughout his tenure at Syzygy, Harris was trained on how the company captures, retains, and grows business and was given access to all of Syzygy's current and potential customers under Syzygy's contracts as well as access to all new business being developed.

11. Harris developed a deep knowledge of Syzygy's entire operation, learning its trade secrets and confidential information. By the time Harris left Syzygy, no other employee had access to more proprietary information belonging to the company.

12. For approximately six months prior to his departure, Harris was responsible for all hiring, candidate outreach, company advertising on recruiting boards, interviewing, and extension of offers, helped with employee onboarding, and had access to every resume for every potential candidate for Syzygy and hired a good portion of Syzygy's staff directly.

13. Harris led Syzygy's Operations Team for multiple years and ran all program management across the company and all of Syzygy's information technology operations, having access to information about all of Syzygy's customers and access to all its proprietary information.

14. Among other things, Harris had access to contact information for Syzygy's current and prospective customers, detailed information on Syzygy's vendors and suppliers, pricing information on Syzygy's current and prospective government contracts, job rates and personnel rates shared only with Syzygy's government clients, compensation data for nearly every employee at Syzygy, salary bands for each position at Syzygy, and comprehensive roadmaps detailing Syzygy's current business and business-development plans for each of its product lines and sectors.

15. Harris was included in all major business development efforts by Syzygy, helping with teaming agreements, proposal strategy, customer strategy, and customer-shaping activities.

16. Harris also led multiple program teams for Syzygy, which encompassed its largest and most-profitable products.

### *Harris's Restrictive Covenants with Syzygy*

17. On August 14, 2020, Harris became an owner in Syzygy as memorialized in the company's Operating Agreement.

18. The Operating Agreement includes the following restrictive covenants in Paragraph 5.9:

> a. In exchange for their membership interest in the Company, in addition to any other standalone restrictive covenant contained in such Member's employment agreement or elsewhere, each Employee Member hereby

agrees that for so long as such Employee Member is a Member of the Company and for a period of five (5) years after the sale of his Membership Interest for any reason (the "Restriction Period"), such Employee Member will not, indirectly or indirectly, do any of the following:

(i)     engage in, or invest in, own, operate, manage, finance, control or participate in the ownership, operation, management, financing or control of, act as a consultant or advisor to, be employed by, associated with or in any manner connected with, or render services or other advice or aid to, or guarantee an obligation of, any individual or entity engaged in, or planning to become engaged in (each, a "Competing Organization"), any other business whose products, services or activities compete in whole or in part with any other business engaged in by the Company, in the United States; provided, however, that an Employee Member shall not violate the foregoing restrictions by reason of ownership of less than 5% of the outstanding equity of any publicly-traded Competing Organization;

(ii)    solicit the Company's customers or clients for the purpose of offering any investment management service, or any investment management product, that competes directly with the Company or provide any investment management services or any investment management products to any of the Company's customers, or clients that were provided to such customers or clients while such Employee Member was a Member of the Company; or

(iii)   employ any individual or entity who is an employee of the Company or any of its Affiliates, or take any action intended to have the effect of causing any such employee to terminate his or her employment with Company or any of its Affiliates.

b.     Each Employee Member acknowledges and agrees that the covenants set forth in this Section 5.9 are reasonable with respect to their duration, geographic area and scope. In the event of a breach by an Employee

Member of any covenant set forth in Section 5.9, the term of such covenant will be extended by the period of the duration of such breach.

c.      Each Employee Member acknowledges and agrees that subsection (a) and (b) of this Section are intended to protect and preserve the legitimate business interests of Company. Each Employee Member further acknowledges and agrees that any breach of either subsection (a) or (b) of this Section 5.9 will render irreparable harm to Company. In the event of a breach of either subsection (a) or (b) of this Section 5.9, the Company shall have available to it all remedies available at law or equity, including, but not limited to, temporary or permanent injunctive relief to restrain such Employee Member from violating subsection (a) and/or (b) of this Section 5.9.

### ***Defendants Induce Harris to Violate His Restrictive Covenants***

19.     In late 2021, Sherpa 6 and Dames started recruiting Harris to come work for them.

20.     On November 16, 2021, Dames and Harris met for lunch in Springfield, Virginia, to discuss Harris coming to Sherpa 6.

21.     Harris eventually interviewed with a panel of Sherpa 6 personnel on February 25, 2022.

22.     On March 8, 2022, Harris attended a second interview and received and accepted a verbal job offer from Sherpa 6's Chief Operating Officer, James Hamilton.

23.     On March 16, 2022, Mitchell and Harris met in person at Syzygy's headquarters in Conshohocken, Pennsylvania, where Harris told Mitchell that he was

resigning his position at Syzygy, but also lied by telling Mitchell that he did not know where he would work next and had no plans, but thought he might take a vacation.

24. On information and belief, Dames instructed Harris to lie to Mitchell during this meeting and to pretend that he had no definite plans, when he had in fact already accepted a verbal offer from Sherpa 6 more than a week earlier.

25. In a call on March 18, 2022, Dames told Mitchell that Harris had submitted his resume to Sherpa 6. Mitchell immediately told Dames that Harris had a non-competition agreement and that, as Dames was aware, Sherpa 6 is a competitor of Syzygy and that Syzygy would make every effort to enforce the non-competition agreement, including taking legal action as necessary.

26. On March 22, 2022, Mitchell set another call with Harris for approximately 4:45 p.m. During this call, Harris told Mitchell he had worked out a career path with Dames at Sherpa 6.

27. Mitchell then told Harris that Sherpa 6 is a competitor and that he would be in violation of his non-competition agreement by accepting employment, and Harris asked for a waiver from Syzygy to work at Sherpa 6, acknowledging that his planned employment would breach his non-compete.

28. In another call with Harris on March 28, 2022, Mitchell advised Harris that Syzygy would not waive the non-competition agreement, despite his repeated requests to do so.

29. On March 31, 2022, in a text message exchange with Dames, Mitchell reiterated that Harris's planned employment with Sherpa 6 would violate his non-compete and that Syzygy would move to enforce it.

30. Immediately on receiving Mitchell's text, Dames asked Harris to see a copy of his non-compete "so we can review and arm you with counsel."

31. Harris began working at Sherpa 6 on April 4, 2022.

32. Mitchell subsequently reached out to Harris at least five more times on April 6, 7, and 8, 2022, but received no response.

### *Syzygy Sues Harris to Protect Itself from Unfair Competition*

33. Seeing that Sherpa 6 and Dames paid no heed to Harris's restrictive covenants and were determined to employ him in contravention of those covenants, Syzygy and Mitchell had no alternative but to vindicate their rights in court.

34. On April 14, 2022, Syzygy filed a Verified Complaint against Harris for breach of his restrictive covenants and associated causes of action, as well as a Motion for Temporary Restraining Order and Preliminary Injunction to prevent Harris from working for Sherpa 6 in breach of his restrictive covenants.

35. By letter dated April 15, 2022, Syzygy's counsel provided Sherpa 6's counsel with copies of its Verified Complaint against Harris and its Motion for Temporary Restraining Order and Preliminary Injunction, which papers included full and complete copies of the restrictive covenants between Harris and Syzygy.

36. Despite being on notice of the restrictive covenants between Harris and Syzygy, Defendants responded by funding Harris's entire legal defense and continuing to employ him until the federal court enjoined them from doing so.

### *The Federal Court Enjoins Harris from Working for Sherpa 6*

37. On July 21, 2022, following a three-day preliminary-injunction hearing at which Mitchell, Harris, and Dames testified, Judge Bartle enjoined Harris from working for Sherpa 6 for two years. *Syzygy Integration LLC v. Harris*, 616 F. Supp. 3d 439 (E.D. Pa. 2022).

38. Among other things, Judge Bartle noted that Mitchell advised Dames about Harris's non-compete on March 18, 2022. *Id.* at 446.

39. Furthermore, after examining the facts and circumstances surrounding the Operating Agreement, the Court concluded that "Syzygy has proven that it is reasonably probable the operating agreement constitutes a valid contract." *Id.* at 448.

40. The Court further concluded that Syzygy and Sherpa 6 "overlap enough in the services they provide so that they are competitors 'in whole or in part'" and

thus that Harris breached the Operating Agreement by working for Sherpa 6. *Id.* at 448, 450.

41. Turning to the non-competition covenant itself, Judge Bartle found that the covenant "protects a legitimate business interest" and "is reasonably necessary for Syzygy . . . to protect [its] interests from its direct competitors." *Id.* at 449.

42. For all these reasons, Judge Bartle issued an injunction barring Harris "from working for, advising, or aiding Sherpa 6 in any capacity for two years[.]" *Id.* at 451.

43. Following Judge Bartle's ruling, Syzygy and Harris amicably resolved their remaining differences, but Sherpa 6 did not participate in this settlement.

## COUNT ONE
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

44. Plaintiffs incorporate the foregoing Paragraphs.

45. As detailed above, Syzygy and Mitchell had a valid non-competition covenant with Harris that—among other things—prohibited him from working for Syzygy's direct competitors, including Sherpa 6. The covenant's validity has been sustained in federal court. *See Syzygy*, 616 F. Supp. 3d at 449.

46. Despite their knowledge of this covenant, Sherpa 6 and Dames aggressively recruited Harris and encouraged him to breach the covenant by leaving Syzygy and coming to work for them.

47. Even after receiving notice of Syzygy's lawsuit to enforce the covenant and motion for temporary and injunctive relief, Sherpa 6 and Dames purposefully persisted in their chosen course by funding Harris's legal defense, thereby driving up Syzygy's costs to vindicate its contractual rights.

48. Sherpa 6 and Dames had no privilege or justification for their actions.

49. By their actions, Sherpa 6 and Dames have caused substantial damage to Syzygy and Mitchell, including without limitation: (1) direct economic damages to Syzygy and Mitchell; (2) emotional-distress damages to Mitchell; and (3) consequential damages to Syzygy in the form of attorney's fees and litigation costs of approximately $500,000 that are recoverable under Restatement (Second) of Torts § 914 and *Seaboard Sur. Co. v. Permacrete Const. Corp.*, 221 F.2d 366 (3d Cir. 1955).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendants:

A. Declaring that the acts complained of herein constitute tortious interference with the contractual relations between Plaintiffs and Harris under Pennsylvania law.

B. Awarding Plaintiffs all compensatory damages sustained as a result of Defendants' tortious interference.

C. Awarding Plaintiffs all consequential damages sustained as a result of Defendants' tortious interference, including without limitation all attorney's fees and litigation costs incurred in prosecuting the *Syzygy v. Harris* action.

D. Awarding Plaintiffs punitive damages on the basis of Defendants' wanton, reckless, malicious, and oppressive actions as complained of herein.

E. Granting Plaintiffs such other and further relief as the Court deems just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

**JACKSON LEWIS P.C.**

Dated: March 21, 2024

*/s/ Jonathan R. Cavalier*
Jonathan R. Cavalier (PA No. 206063)
jonathan.cavalier@jacksonlewis.com
Daniel F. Thornton (PA No. 318431)
daniel.thornton@jacksonlewis.com
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
267-319-7802

*Counsel for Syzygy Integration LLC and Wesley Mitchell*